

F I L E
AUG 18 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA

v.  Criminal Case No. 3:12cr77–04

ONESIMO MARCELINO,

      Petitioner.

## REPORT AND RECOMMENDATION

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) as to the Amended Motion to Vacate, Set Aside, or Correct a Sentence filed by counsel on behalf of Onesimo Marcelino ("Marcelino"), a federal prisoner, pursuant to 28 U.S.C. § 2255 ("Amended § 2255 Motion") (ECF No. 205). The Court held an evidentiary hearing, after which the parties submitted proposed findings of fact and conclusions of law. (ECF Nos. 212, 213.) The matter is ripe for disposition. For the following reasons, the Court RECOMMENDS that Marcelino's claim of ineffective assistance of counsel be DISMISSED and the Amended § 2255 Motion be DENIED.

### I. Factual and Procedural Background

On April 18, 2012, four Criminal Complaints were filed, charging Marcelino and three others—Mohamed Labidi, Wissem Ayachi, and Joe Ovalles—with conspiracy to receive and possess contraband cigarettes, in violation of 18 U.S.C. §§ 371 & 2342. (Criminal Compls. 1, ECF Nos. 1, 2, 3, 4.) Labidi and Ayachi also faced drug charges. (*Id.*) At the initial appearance, it was noted that an interpreter would be provided for Marcelino throughout the proceedings. (ECF No. 5.) Marcelino retained Vaughan Jones

("Jones") to represent him, and Jones appeared at the preliminary and detention hearings on April 23, 2012. (ECF No. 12.) On May 2, 2012, a grand jury charged Marcelino and the same three co-defendants with conspiracy to ship, transport, receive, possess, sell, distribute, and purchase contraband cigarettes, in violation of 18 U.S.C. §§ 371 & 2342 (Count Five), and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Eleven). The three co-defendants faced additional charges. (Indictment, ECF No. 19.) All four defendants were arraigned on May 14, 2012, and their jury trial was scheduled for July 9, 2012. (Docket Entry dated May 3, 2012; ECF No. 21.)

On June 18, 2012, the Court was informed that Marcelino would plead guilty, so the Court scheduled a plea hearing before then United States Magistrate Judge M. Hannah Lauck[1] for June 19, 2012. (Docket Entry, June 18, 2012.) The parties appeared in the courtroom but, due to an inability to reach an agreement regarding the language in the proposed written statement of facts, the plea hearing was cancelled prior to Judge Lauck taking the bench. (Docket Entry, June 19, 2012; Evid. Hr'g Tr. 68:9–71:3, ECF No. 209.) Defendants Ovalles, Labidi, and Ayachi pled guilty on June 21, 22, and 22, respectively. (ECF Nos. 26–42.) On June 21, 2012, counsel for Marcelino and counsel for the United States asked the Court to reschedule Marcelino's plea hearing, and a plea hearing was scheduled for June 25, 2012. (Docket Entry, June 21, 2012.) On June 25, 2012, Marcelino pled guilty to Counts Five and Eleven before Judge Lauck without a written plea agreement or a written statement of facts. (Guilty Plea Hr'g Tr. 2–3, ECF No. 121.) On that same date, Judge Lauck issued a Report and Recommendation on

---

[1] Judge Lauck was confirmed as a United States district judge in June 2014.

Marcelino's pleas of guilty. (ECF No. 45.) On July 9, 2012, United States District Judge Henry E. Hudson adopted the Report and Recommendation and accepted Marcelino's guilty pleas. (ECF No. 47.) On September 28, 2012, Marcelino was sentenced by Judge Hudson to 60 months on Count Five and 132 months on Count Eleven, to be served concurrently. (ECF No. 93.) Judge Hudson also ordered Marcelino to pay $5,088,540.00 in restitution pursuant to the Restitution Order entered on the same date. (ECF No. 94.) The Judgment in a Criminal Case was entered on October 1, 2012. (J. 2, ECF No. 98.)[2] Counsel Vaughan Jones represented Marcelino throughout these proceedings but, on October 3, 2012, the Court received a letter from Jones advising the Court that his license to practice law had been suspended for two months, beginning on October 1, 2012. (ECF No. 100.) As a result, Jones stated, he could not continue to represent Marcelino and, since Marcelino indicated that he wished to appeal the Court's rulings at the sentencing hearing, Jones requested that the Court appoint new counsel. (*Id.*) W. Edward Riley was appointed to represent Marcelino on appeal, but thereafter, according to the record in the United States Court of Appeals for the Fourth Circuit, Marcelino retained Kenneth Ravenell to represent him on appeal. (ECF No. 102.)

On appeal to the United States Court of Appeals for the Fourth Circuit, Marcelino argued that "his conviction on the money laundering count 'merged' with his conviction for contraband cigarettes . . . such that the 132-month sentence imposed on the former count was improper." *United States v. Marcelino*, 537 F. App'x 217, 219 (4th Cir. 2013).

---

[2] On November 1, 2012, the Court entered an Amended Judgment in a Criminal Case to correct the total amount of the special assessment imposed against Marcelino. (Am. J. 1, ECF No. 113.)

Marcelino also argued "that the district court erred in denying his objections seeking acceptance of responsibility," and he "contest[ed] the enhancement he received for his leadership role." *Id.* The Fourth Circuit concluded that Marcelino's merger argument was waived because "[b]y pleading guilty . . . Marcelino admitted that he engaged in conduct that satisfied the elements for convictions under both the contraband cigarettes count and the money laundering count." *Id.* The Fourth Circuit also concluded that this Court "did not clearly err when it denied both of Marcelino's objections at sentencing." *Id.* at 220. The United States Supreme Court denied Marcelino's petition for a writ of certiorari. *Marcelino v. United States*, 134 S. Ct. 968 (2014).

On July 15, 2014, the Court received Marcelino's initial § 2255 Motion and memorandum in support asserting that his trial counsel was ineffective. (§ 2255 Motion 1, ECF Nos. 161, 162.) The claim set forth in the initial § 2255 Motion and memorandum in support was:

> Claim One: Counsel rendered ineffective assistance post-plea by "specifically instruct[ing Marcelino] to remain silen[t]" with respect to the extent of his criminal activity. Because Marcelino followed this advice, the Court denied him a reduction for acceptance of responsibility at sentencing. (Mem. Supp. § 2255 Mot. 2–3, ECF No. 162.)

The United States responded (ECF No. 171), and a Memorandum Opinion and Order were issued on September 23, 2016, referring Claim One for an evidentiary hearing. (ECF Nos. 181, 182). The Court appointed counsel to represent Marcelino with regard to the § 2255 proceeding, and the evidentiary hearing was scheduled for January 26, 2017. (ECF Nos. 183, 185; Docket Entry dated September 23, 2016.) Thereafter, by counsel,

4

Marcelino sought to amend his § 2255 Motion. (ECF Nos. 190, 198, 200). The Court granted the motion to amend, and the Amended Motion to Vacate, Set Aside, or Correct a Sentence (ECF No. 205) was filed, supplanting the initial § 2255 Motion. The claim in the Amended § 2255 Motion is as follows:

> Mr. Marcelino's Sixth Amendment right to effective assistance of counsel was violated because Mr. Jones provided unreasonable advice regarding the consequences of his actions with respect to receiving a reduction in his offense level under U.S.S.G. § 3E1.1 for acceptance of responsibility.
>
> A. Mr. Jones performance was ineffective if he advised Mr. Marcelino that all he needed to do in order to receive a reduction for acceptance of responsibility was to plead guilty.
>
> B. Mr. Jones's performance was ineffective when he allowed Mr. Marcelino to admit to all of the facts proffered by the government at the plea hearing without objection.
>
> C. Mr. Jones's performance was ineffective when he allowed Mr. Marcelino to attempt to minimize or deny some of the facts admitted to at the plea hearing and did not advise him that doing so would cost him any chance of receiving a reduction for acceptance of responsibility.

(Amended § 2255 Motion 13, 15, 17, 20, ECF No. 205.)

On April 4, 2017, the evidentiary hearing was rescheduled for June 26, 2017. (ECF No. 206). The evidentiary hearing was held, the transcript was filed, and the parties have filed their proposed findings of fact and conclusions of law. (ECF Nos. 208, 209, 212, 213.)

## II. Standard of Review and Burden of Proof

A petitioner collaterally attacking his or her conviction bears the burden of proving that the conviction imposed violated the United States Constitution or laws, that the court lacked jurisdiction to impose such a sentence, that the sentence exceeded the

maximum authorized by law, or that the sentence otherwise is subject to collateral attack. 28 U.S.C. § 2255. The petitioner has the burden of proving the grounds for the collateral attack by a preponderance of the evidence. *Vanater v. Boles*, 377 F.2d 898, 900 (4th Cir. 1967); *White v. United States*, 352 F. Supp. 2d 684, 686 (E.D. Va. 2004). In a § 2255 proceeding, a court may hold an evidentiary hearing to "determine the issues and make findings of fact and conclusions of law." 28 U.S.C. § 2255(b). When making findings of fact, the court should determine the credibility of witnesses and reliability of other evidence. *See United States v. Roane*, 378 F.3d 382, 393–94, 409 n.15 (4th Cir. 2004).

### III. Findings of Fact

Supplementing the procedural events above, the Court makes the following findings of fact based on the record, as well as the testimony and exhibits submitted at the evidentiary hearing.

**A.    Plea Negotiations**

1.    Marcelino and Jones reviewed the discovery provided to the defense by the United States, discussed the case numerous times prior to Marcelino's guilty plea, and discussed whether it made sense to go to trial or to plead guilty. (Evid. Hr'g Tr. 56:10–24, ECF No. 209.)

2.    Marcelino "was adamant that he wanted to plead guilty" because "he understood that he did not have a viable defense." (Evid. Hr'g 57:1–8.) Jones agreed that Marcelino should not go to trial, even though Marcelino had several "points of contention" with the evidence and theory of the case of the United States. (Evid. Hr'g Tr. 56:25–59:19.)

3.      Jones began plea negotiations with the United States. Some of the plea negotiations are reflected in emails exchanged between Jones and counsel for the United States, Stephen Miller. Those emails were filed at the evidentiary hearing as Defendant's Exhibits 1, 2 & 4.[3] The discussions included the following points of contention: the quantity of cigarettes Marcelino sold, where the cigarettes were sold, Marcelino's role with regard to his co-defendants, the amount of restitution Marcelino would be ordered to pay, and the possibility of credit for acceptance of responsibility, all of which would impact the calculations of the United States Sentencing Guidelines with regard to Marcelino. (Evid. Hr'g Tr. 59:22–65:4.)

4.      Jones was aware that the attempt to secure a credit for acceptance of responsibility for Marcelino "in some ways conflicted with his other endeavor, which was to not be held to be a leader because he did not ever acknowledge that, and to [limit] the amount of tax loss." (Evid. Hr'g Tr. 65:25–66:3.) Jones realized that this was like walking a tightrope—attempting to secure acceptance of responsibility for Marcelino but also to keep the Sentencing Guidelines calculations regarding Marcelino's offense level as low as possible and to minimize the amount of restitution Marcelino would be ordered to pay. (Evid. Hr'g Tr. 64:23–66:10.)

5.      Jones understood that it was going to be difficult for Marcelino to receive credit for acceptance of responsibility, and he warned Marcelino about this and told him that it was not guaranteed even if he pled guilty. (Evid. Hr'g Tr. 66:10–67:13.)

---

[3] Petitioner Marcelino's exhibits were referred to and labeled as Defendant's Exhibits.

6.     Jones and counsel for the United States attempted to craft a written statement of facts to which both attorneys and Marcelino would agree, but upon reviewing the proposed written statement of facts just prior to the scheduled plea hearing on June 19, 2012, an agreement could not be reached regarding a written statement of facts, in particular, paragraph 11 of the proposed written statement of facts, and the plea hearing was cancelled. (Evid. Hr'g Tr. 67:14–71:3.)

7.     Shortly thereafter, Jones and counsel for the United States resumed their efforts to negotiate a plea deal and ultimately agreed that there would be no written statement of facts because, although Marcelino wanted to plead guilty and was willing to admit to the two charges against him in the indictment, he was not willing to agree to the written version of facts insisted upon by counsel for the United States. (Evid. Hr'g Tr. 71:4–74:19.)

**B.     Marcelino's Plea Hearing**

8.     On June 25, 2012, Judge Lauck conducted Marcelino's plea colloquy, during which Marcelino pled guilty to the two counts in which he was charged in the Indictment, Counts Five and Eleven, without a written plea agreement or a written statement of facts. (Guilty Plea Hr'g Tr., ECF No. 121.)

9.     Shortly after the plea hearing began, counsel for the United States made the following statement regarding the possibility of credit for acceptance of responsibility:

> And I just want to put on the record I don't think that there's anything the Court needs to do with that, but I want it clear on the record the United States has concerns about the candor of the defendant, and so by this agreement —or by this plea, we are not agreeing that the defendant is entitled to any points for acceptance of responsibility. And I've already

notified defense counsel that we are not interested in debriefing or the cooperation of the defendant, and there will be no substantial assistance motion.

(Guilty Plea Hr'g Tr. 3:16–25.)

10. Later during the plea colloquy, Judge Lauck referred back to the statement by counsel for the United States when addressing how Marcelino's sentence would be determined, including acceptance of responsibility:

The Court: And do you know there are a whole set of factors that can be considered, and have to be considered, under the guidelines. They include information about acceptance of responsibility, which the government indicated there may be a dispute about here. But it includes a whole set of factors that can affect your recommended guideline range up or down; do you understand that?

Mr. Marcelino: Yes.

(Guilty Plea Hr'g Tr. 12:15–23.)

11. Judge Lauck informed Marcelino early during the colloquy that "if at any time I'm asking you something and you're not sure what I'm trying to ask, interrupt me and speak to your lawyer before you give me an answer." She also informed him that he could withdraw his plea any time before it was accepted. Marcelino did, at times, request clarification of something Judge Lauck was asking. (Guilty Plea Hr'g Tr. 5:1–2, 6:6–15, 7:12, 25:5.)

12. Under oath at the plea hearing, Judge Lauck questioned Marcelino several times about his opportunities to consult with Jones prior to entering guilty pleas to the two charges. Marcelino informed Judge Lauck that he had a sufficient opportunity to discuss the case with Jones and that he was satisfied with Jones's representation:

> The Court: Have you had a sufficient opportunity to discuss with your attorney everything about your case, including any possible defenses, as well as discussing the decision of whether or not to plead guilty?
>
> Mr. Marcelino: Yes.
>
> The Court: Have you discussed with your attorney how your sentence will be determined? Have you talked about the sentencing guidelines?
>
> Mr. Marcelino: Yes.
>
> The Court: Are you entirely satisfied with what your attorney has done for you? Do you believe that Mr. Jones has done all you needed so you can make an informed choice about how to proceed?
>
> Mr. Marcelino: Yes.

(Guilty Plea Hr'g Tr. 9:3–16.)

13.    Judge Lauck specifically questioned Marcelino about going forward without a written plea agreement or written statement of facts.

> The Court: All right. Now, you're proposing, Mr. Marcelino, to go forward pleading just to the indictment without a plea agreement or statement of facts in place, and I want to confirm did you have enough time to speak to your attorney about that choice, about pleading with or without a plea agreement?
>
> Mr. Marcelino: Yes.

(Guilty Plea Hr'g Tr. 11:21–12:2.)

14.    Marcelino confirmed that he decided to plead guilty to the charges because he was in fact guilty of both charges. (Guilty Plea Hr'g Tr. 11:11–14.)

15.    Since there was no agreed-upon written statement of facts, Judge Lauck requested that counsel for the United States provide "the basis in fact" for the pleas, and counsel for the United States then set forth a lengthy and detailed proffer of the facts.

(Guilty Plea Hr'g Tr. 15:15–24:23.) Expert witness for Marcelino at the evidentiary hearing, Gerald Zerkin, testified that the proffer was "unusually long." (Evid. Hr'g Tr. 135:13–19.)

16. Upon completion of the proffer, Judge Lauck then asked Marcelino: "All right, Mr. Marcelino, is that what happened?" Marcelino responded: "Yes." Then, the following exchange took place:

> The Court: Is there anything about what the prosecutor offered as the basis of statement of fact that you would contest any part of it?
>
> Mr. Marcelino: One—one second, please.
>
> Mr. Jones: Your Honor, Mr. Marcelino wholeheartedly accepts his responsibility for the facts that are stated in the indictment. Mr. Marcelino would add that he was not the sole customer for Mr. Labidi and Mr. Ayachi in their sale of contraband cigarettes. He wholeheartedly accepts that he did buy contraband cigarettes, that he did sell contraband cigarettes, and that it was to the financial detriment of the United States of America.
>
> The Court: All right. Well, Mr. Marcelino, the fact that you may or may not have been the only customer is not inconsistent, but the fact that you were the customer as articulated, or at least a participant as articulated by Mr. Miller in the courtroom today. And I know, Mr. Jones, I don't mean to be picky about sort of what you said, but what you said is that he's accepting what happened in the indictment, and so what I—what I have in front of me by way of a basis in fact is what Mr. Miller said today. So I want to confirm, Mr. Marcelino, is there anything in what Mr. Miller said today about what happened that is—that you are not—you are saying is not true?
>
> Mr. Marcelino: No.
>
> The Court: So, are you pleading guilty because you are guilty of what he just said?
>
> Mr. Marcelino: Yes.

The Court: All right. Then I can make the findings of guilt, sir. So this would be your last opportunity to withdraw your two guilty pleas. Are you prepared for me to go ahead and make my finding?

Mr. Marcelino: Yes.

The Court then found Marcelino competent to enter an informed plea, found the pleas to be knowing and voluntary and supported by an independent basis in fact, accepted the pleas, and found Marcelino guilty of the two offenses with which he was charged. (Guilty Plea Hr'g Tr. 24:24–26:21.)

17.    Jones made the statement to the Court set forth immediately above in order to attempt to limit Marcelino's exposure with regard to offense level, but Judge Lauck then asked Marcelino directly again if there was anything that Mr. Miller said that Marcelino would say is not true. Marcelino, with no prompting from Jones, answered "no." (Evid. Hr'g Tr. 75:2–79:25.)

18.    Judge Lauck told Marcelino in great detail how his sentence would be determined, that the sentencing judge would determine his sentence advised by the Sentencing Guidelines and other factors, and that the sentencing judge could depart upward or downward from the advisory range under the Sentencing Guidelines if appropriate, "within reason." (Guilty Plea Hr'g Tr. 11:15–14:4.)

19.    Because there was no written statement of facts, Judge Lauck noted from the bench at the end of the plea colloquy that Judge Hudson wanted a transcript of the statement of facts as proffered by counsel for the United States. (Guilty Plea Hr'g Tr. 28:25–29:4.)

## C. Post-Plea Hearing Events

20. On July 17, 2012, the United States Probation Officer met with Marcelino and Jones in order to prepare the Pre-Sentence Report. Jones remained at the meeting longer than he usually does because of the factual issues in the case. (Evid. Hr'g Tr. 80:16–23.) Jones did not want Marcelino to make a statement about the facts outside of his presence because Jones was still walking that "tightrope"—trying to prevent any increases in Marcelino's offense level while at the same time trying to secure acceptance of responsibility for Marcelino. It was Jones's intention to assist Marcelino in providing a written statement of facts at a later time. (Evid. Hr'g Tr. 80:1–83:15.)

21. There were two attempts to provide an acceptable written statement. The first involved the proposed written statement of facts to which the parties had been unable to agree on June 19, 2012, filed as part of the record in this case as ECF No. 86-1. According to Jones, Marcelino "was willing to concede the facts that—in a previously proffered statement of facts minus some information, at least one paragraph." (Evid. Hr'g Tr. 81:16–18.) However, that statement, which was provided to the United States Probation Officer and counsel for the United States on September 5, 2012, was not acceptable to either of them. Despite that lack of acceptance, it was filed as Exhibit 1 to the Position of the Defendant with Respect to Acceptance of Responsibility at Sentencing. (ECF Nos. 77, 77–1.) The second attempt involved a statement prepared by Jones after several interviews of Marcelino. This document was filed as Exhibit 2 to the Position of the Defendant with Respect to Acceptance of Responsibility at Sentencing, (ECF No. 77-2), and also was filed as Def.'s Ex. 6 at the Evidentiary Hearing. Jones's

notes regarding that statement were filed as Def.'s Ex. 3. (Evid. Hr'g Tr. 22:3–8; 81:13–92:3.) *See also* ECF Nos. 205–1 (two versions of a statement of facts) and 205-3.

22.     In preparation for the sentencing hearing, Jones objected, on Marcelino's behalf, to the fact that Marcelino had not been given credit for acceptance of responsibility by the United States Probation Officer when he prepared the Pre-Sentence Report ("PSR"), pursuant to U.S.S.G. § 3E1.1; to the four-level adjustment for Marcelino's role in the offense, pursuant to U.S.S.G. § 3B1.1(a); and to the calculation of the tax loss. All three of the objections affected the calculations of the Sentencing Guidelines and, ultimately, the advisory Guideline range. (Def.'s Objs. to PSR, ECF No. 58.) Jones filed, on behalf of Marcelino, objections, a sentencing position, and a motion for a downward variance. (ECF Nos. 58, 77, 78.) Pursuant to U.S.S.G. § 3E1.1, a defendant may receive a two-level decrease in his offense level if he "clearly demonstrates acceptance of responsibility for his offense." If he qualifies for the two-level decrease, he may qualify for an additional one-level reduction, but that reduction is dependent on a "motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty . . . ." U.S.S.G. § 3E1.1 (2011).[4]

**D. Marcelino's Sentencing Hearing**

23.     Jones argued each of the objections he filed, asserting, among other points, that Marcelino acknowledged the total quantity of cigarettes charged by signing the

---

[4] The November 1, 2011 edition of the United States Sentencing Guidelines was used to prepare Marcelino's PSR.

restitution order. After hearing argument from counsel, Judge Hudson overruled Marcelino's objections, as set forth in the transcript of the sentencing hearing. Judge Hudson ruled that Marcelino had not clearly demonstrated acceptance of responsibility as required by U.S.S.G. § 3E1.1. (Sent. Hr'g Tr. 4:8–16:7; 16:8–33:6; 35:10–42:18; ECF Nos. 119 & 171-2.)

24.     Judge Hudson also considered but denied the motion for downward variance filed by Jones on behalf of Marcelino, as well as the motion for upward variance filed by counsel for the United States. (Sent. Hr'g Tr. 54:3–13.) He found, pursuant to the PSR, that Marcelino's total offense level was 30 and that his criminal history placed him within criminal history category III, which together yielded an advisory Sentencing Guideline range of 121 to 151 months of imprisonment, although the statute charged in Count Five permitted only a 60-month maximum sentence. (Sent. Hr'g Tr. 3:6–15; 42:13–18; PSR, ECF No. 65.)

25.     If Marcelino had admitted to selling in New York City all of the untaxed cigarettes for which he was held accountable with regard to the state of New York, he would have been held accountable for at least $1,651,500.00 in additional restitution, calculated by multiplying the number of cartons for which he was held accountable for restitution to the state of New York—110,100 cartons[5]—times the New York City tax of $15.00 per cartoon. If Marcelino had admitted to additional untaxed cigarettes sold in

---

[5] For purposes of relevant conduct, Marcelino was held accountable for 111,570 cartons of untaxed cigarettes, but that figure was reduced to 110,100 for restitution purposes because 1470 cartons were recovered by law enforcement agents and, as such, were not included in the restitution calculation.

New York City, then that figure would have increased. For purposes of calculating the offense level, at least 111,570 cartons of untaxed cigarettes (or more if Marcelino admitted to a larger number) would be multiplied by $15.00 per carton, for at least an additional $1,673,550 going into the offense level calculation. Depending upon precisely what Marcelino admitted, the amount of tax loss could have increased his total offense level from 30 to 32 because the offense level for each count in this case was driven by the intended tax loss, pursuant to U.S.S.G. § 2T4.1. If that increase in offense level had occurred, then his advisory Sentencing Guidelines range would have been 151 to 188 months of imprisonment, an increase of 30 to 37 months above the range Judge Hudson applied. The United States believed, but could not establish without confirmation from Marcelino, that most if not all of the untaxed cigarettes were sold in New York City. Thus, by not admitting to the scope of the conspiracy that the United States maintained existed or to the details of his sales, Marcelino was able to reduce the amount of restitution due by approximately $1.65 million and to keep his total offense level at 30 rather than 32, thus likely saving himself approximately 30 to 37 months of imprisonment, less any good time credit he might earn. *See* PSR ¶¶ 100, 101, & Worksheets (ECF No. 65).

26. During its argument as to the appropriate sentence for Marcelino, the United States asked Judge Hudson to sentence him to the longest possible sentence under the advisory Sentencing Guideline range—151 months of imprisonment. The defense sought a sentence at "the lowest end of the sentencing range of 121 months." Prior to imposing a sentence, Judge Hudson gave Marcelino an opportunity to address the Court,

but he declined to do so. Judge Hudson sentenced Marcelino to 132 months on Count Eleven and 60 months on Count Five, to be served concurrently. (Sent. Hr'g Tr. 55:22–59:1.)

## E. Marcelino's Account of his Communications with Jones

27.     The Declaration of Onesimo Marcelino (submitted as Def.'s Ex. 5 at the Evidentiary Hearing and filed as ECF No. 205–4), states as follows:

> 1.   I was represented in this case by Mr. Vaughan Jones, who appeared as counsel of record at both my plea hearing and my sentencing hearing.
>
> 2. Mr. Jones and I met to discuss the possibility of pleading guilty, and I informed Mr. Jones that I wanted to plead guilty. As part of our discussion, Mr. Jones told me about the 3-level reduction for "Acceptance of Responsibility" under the sentencing guidelines. I informed Mr. Jones that I wanted to receive that reduction and entrusted him to advise me what was necessary to do so. Mr. Jones told me that as long as I pled guilty, I would receive a reduction for Acceptance of Responsibility.
>
> 3. I do not recall Mr. Jones discussing a written plea agreement with me prior to my plea hearing, and I do not recall whether Mr. Jones advised me about the difference between pleading guilty with a written plea agreement and statement of facts versus pleading guilty without those written documents.
>
> 4.   I do not recall Mr. Jones being present for my presentence interview with the probation officer, and I do not recall Mr. Jones telling me anything about Acceptance of Responsibility prior to the presentence interview.
>
> 5.   Approximately two weeks before my sentencing hearing, Mr. Jones met with me to discuss the Presentence Report and the guideline calculations.   He informed me that the Presentence Report did not recommend that I receive any reduction for Acceptance of Responsibility. He advised me that, in order to get the reduction, I would need to submit a statement to the Court.   He asked me to put into my own words what happened, asked me questions, and took some notes.

6. Approximately one week before my sentencing hearing, Mr. Jones brought me a statement to sign. Mr. Jones nor anyone else read this letter to me in Spanish or talked to me about its contents. Mr. Jones simply told me to sign it in order to get the 3 points. I signed the statement because I trusted Mr. Jones' advice that I needed to do so in order to get a reduction for Acceptance of Responsibility.

7. Mr. Jones did not discuss with me whether the statement that I signed was inconsistent with the facts proffered by the government at my plea hearing. Had Mr. Jones informed me that the statement was inconsistent with any of the facts that I admitted to at my plea hearing, I would not have signed the letter.

8. At no time after my plea hearing and before my sentencing hearing did Mr. Jones discuss with me the facts proffered by the government at my plea hearing, nor the implications of my agreeing to those facts under oath at the plea hearing.

9. I never told Mr. Jones that I wanted to contest the 4-level enhancement for a leadership role no matter what, even if it meant losing the possibility of receiving a reduction for Acceptance of Responsibility.

10. Mr. Jones did not inform me prior to my sentencing hearing that his license was going to be suspended effective October 1, 2012, the Monday after my sentencing hearing on Friday, September 28, 2012. I first learned about his suspension after the sentencing hearing.

(Def.'s Ex. 5 & ECF No. 205–4)

28. Marcelino did not testify at the evidentiary hearing. (Evid. Hr'g Tr., ECF No. 209.)

## F. Jones's Account of his Communications with Marcelino

29. Jones's account of the communications between Jones and Marcelino differs substantially from Marcelino's declaration.

30. Jones testified that he warned Marcelino that it was going to be difficult for him to receive credit for acceptance of responsibility even if he pled guilty. Jones

testified that they "talked about [acceptance of responsibility] a lot," (Evid. Hr'g Tr. 63:19–24), that he explained that "[t]he endeavor to get him credit for accepting responsibility and pleading guilty in some ways conflicted with his other endeavor, which was to not be held to be a leader . . . and to [limit] the amount of tax loss," and that he "told him that just saying you did it would not get him acceptance of responsibility." (Evid. Hr'g Tr. 65:24–66:17.) Jones also testified that he told Marcelino that he might not get acceptance—that he "told him that directly." (Evid. Hr'g Tr. 67:1–13.) Counsel for the United States also put that on the record at the beginning of the plea hearing, stating that "the United States has concerns about the candor of the defendant" and that the United States was "not agreeing that the defendant is entitled to any points for acceptance of responsibility," and that fact was reiterated by Judge Lauck during the plea colloquy. (Guilty Plea Hr'g Tr. 3:16–25; 12:15–23.)

31.     Jones testified that Marcelino "wouldn't sign what Mr. Miller had ever proffered to [him]," and that he "didn't think Mr. Miller and [he] were getting close enough to anything that [Marcelino] would sign." He also testified that ultimately, he and counsel for the United States agreed to a plea without a written statement of facts. (Evid. Hr'g Tr. 72:21–73:10.)

32.     During the plea colloquy, Judge Lauck specifically questioned Marcelino regarding his pleading without a written plea agreement or a written statement of facts, and Marcelino confirmed that he had "enough time to speak to [his] attorney about that choice." (Evid. Hr'g Tr. 11:21–12:2.)

33.     Jones testified that he was at the meeting with Marcelino and the United States Probation Officer on July 17, 2012, and that he remained at that meeting longer than he usually did because of the factual issues in the case. (Evid. Hr'g Tr. 80:1–83:15.)

34.     Jones testified that in another attempt to secure credit for acceptance of responsibility for Marcelino, he took notes while interviewing Marcelino regarding Marcelino's version of events, included information from "the whole history of interviews," and then prepared a statement for Marcelino's review. He also testified that he met with Marcelino and an interpreter to review the typewritten statement (ECF No. 77-2 & Def.'s Ex 6), that the interpreter read the statement to Marcelino, that with the interpreter's assistance a word was corrected, and that Marcelino agreed with and signed the statement so Jones could file it with the Court. (Evid. Hr'g Tr. 81:13–92:3.)

35.     Marcelino was aware of the proffer of facts made by counsel for the United States during the plea colloquy. It was translated to him and, when asked by Judge Lauck specifically if he disagreed with anything that Mr. Miller said, Marcelino said no. Prior to this exchange during the colloquy, Judge Lauck explained that he could interrupt her and speak to his lawyer if he was uncertain about a question or an answer, and she reminded him of the importance of being truthful. At the meeting with Jones shortly before the sentencing hearing, the statement Marcelino ultimately signed (ECF No. 77–2 & Def.'s Ex. 6) was read to him by an interpreter. Thus, he was aware that his version of events was inconsistent as to several facts with the proffer made by the United States. However, Jones had explained to Marcelino that counsel for the United States had said that the United States would be satisfied only with "the defendant's statement in his own

20

words," so Jones told Marcelino, "if we hope to get acceptance, it's going to be through your statements." Jones had explained to Marcelino that the signed statement would be filed with the Court. (Guilty Plea Hr'g Tr. 5:17–6:15; 24:24–26:22; Evid. Hr'g Tr. 81:13–92:3.)

36.   Marcelino's statement (ECF No. 77–2 & Def.'s Ex. 6) is as follows:

September 14, 2012

My name is Onesimo Marcelino.

I am writing this in my own words so that the judge can understand my crime. I plead guilty because I am guilty. I feel bad for committing this crime for such a long time.

When my lawyer showed me the information that said I was the leader of the Arabs ("Labidi and Ayachi") I knew that was not correct and I will not agree to that because it is not true. They were my boss. They sold to me and many other people. I did not know anything about their drugs or gun sales. My cousin Jose did work for me but the Arabs never did. I want the judge to understand that I am not a leader or a boss and that these sales were not part of a criminal gang.[6]

Labidi approached me about selling cigarettes in 2010. He and Ayachi brought cigarettes to New York and sold them to me in 2010. I live in New York and sold cigarettes there. I was not part of a criminal organization or group. I sold the cigarettes I bought at bodegas in New York. I know that this was illegal. Labidi and Ayachi did not ever work for me. They sold cigarettes to me. I was their customer. They both told me they had many other customers in North Carolina, Florida and Virginia.

In 2011 Labidi said that he was going to stop delivering cigarettes to New York. He said if I wanted to keep getting cigarettes from him I would have to go to Philadelphia to pick them up. I agreed. I went to

---

[6]   This statement was inconsistent with facts Marcelino agreed to at the plea hearing, specifically the description of the defendant and his co-defendants as a "conspiracy" and other statements regarding the relationships among the four defendants. (Guilty Plea Hr'g Tr. 16:2–7; 16:20; 17:1–10; 19:6–20:20.)

Philadelphia to get cigarettes approximately 15 times. Each load I picked up had 10–15 cases. I paid $30,000 to $35,000. (Each carton $39.00) I would re-sell each carton in Philadelphia or New York for $44.00. I knew this was illegal because I wasn't paying tax. Sometimes when I bought cigarettes in Philadelphia I sold them there before I returned home to New York so that I would not risk getting caught travelling with the cigarettes. On some of these trips I came by myself to pick up the cigarettes. On other trips I came with my cousin.

Labidi and Ayachi said they were cousins. They were together but then they separated. At the end of 2010 Labidi told me they had a fight. Labidi said Ayachi was going to keep selling cigarettes to his (Ayachi's) clients in North Carolina. I stayed a client of Labidi's.

Then Labidi disappeared for 6 months. He told me that he was going to his home country. When he returned he called and said that he had new people that could get him merchandise. He asked if I was interested. I said that I was. I did not introduce Labidi to these people.[7] These new friends turned out to be federal agents. Labidi told me that the agents could get whatever he wanted. Labidi told me that he was going to resume selling to his customers in Virginia and North Carolina.

Some time later Ayachi called me. He said he had 20 cases of cigarettes and said that he would get more. He told me not to tell Labidi that I was buying carettes from him (Ayachi) because he (Labidi) would get mad. I agreed because Ayachi was selling the cigarettes for much less ($34) than the price Labidi had been selling them. I agreed to buy cigarettes from Ayachi in Virginia.

I had never been to Virginia before this. When I drove to Virginia to buy cigarettes, Ayachi had to give me turn-by-turn directions to find his storage unit. I did not ever pay to rent a storage unit.[8] I would just meet Ayachi there to get the cigarettes. I did this several more times. I bought approximately 20 cases 4 different times (total 80 cases.) Every time I

---

[7] This statement was inconsistent with a fact Marcelino agreed to at the plea hearing, specifically "Mr. Marcelino sent down Mr. Labidi to also have a conversation with the undercover agents." (Guilty Plea Hr'g Tr. 18:11–20.)

[8] This statement was inconsistent with facts Marcelino agreed to at the plea hearing, specifically that Marcelino's name is listed as a person who is permitted access to the storage unit in Ayachi's name (Guilty Plea Hr'g Tr. 20:21–21:4), and that Marcelino or people operating with his knowledge would pay "for the rental of storage facilities that were used to hide the operation . . . ." (Guilty Plea Hr'g Tr. 23:21–24:6.)

came after I picked up my cases, there would be large amounts (40–80) of extra cases in the storage unit. Ayachi told me those case[s] were for his other clients in Florida, North Carolina and Virginia. On some occasions I sent my cousin Jose to Virginia to pick up the cigarettes.

Ayachi told me that he lived in Florida. He said that he flew from Florida to Virginia [to] purchase cigarettes from his connection ("the agents."). From 2010–2011 I was a client of Labidi or Ayachi's when they worked separately and when they worked together. I did not ever tell them where to get the cigarettes they sold to me. I did not meet the agents or deal with them directly. I am not the person that told the Arabs to buy cigarettes from the agents.[9] Where they (the Arabs) got the cigarettes was their business. I was just interested in buying their (the Arabs') product.

I apologize to the judge, to my lawyer, and to the prosecutor. I know what I did was wrong. All of the sales I described were against the law and I knew it. I feel bad because I involved my cousin Jose. I admit that. I have committed this crime in the past but I will not ever do this or any other crime again. I have a family and friends that love and support me. It is not fair for me to do this to myself or to them.

(ECF No. 77-2 & Def.'s Ex. 6.) This statement also minimizes the quantities of cigarettes that Marcelino purchased and resold during the conspiracy.

37.    Jones testified that Marcelino would never agree to the facts that supported the four-level enhancement. (Evid. Hr'g Tr. 32:22–24; 65:24–66:2; 90:22–92:3.)

## G.    Jones's Version of Events Is More Credible than Marcelino's Version

38.    Having considered the above and having weighed the credibility of the witnesses, the Court finds:

a.    that Jones did not advise Marcelino that all he had to do to receive credit for acceptance of responsibility was to plead guilty;

---

[9] This statement was inconsistent with a fact Marcelino agreed to at the plea hearing, specifically "Mr. Marcelino sent down Mr. Labidi to also have a conversation with the undercover agents." (Evid. Hr'g Tr. 18:11–20.)

23

b.      that Jones advised Marcelino that pleading guilty alone was not sufficient to receive credit for acceptance of responsibility;

c.      that, at the plea hearing, Jones attempted to accommodate Marcelino's desire to plead guilty, limit Marcelino's offense level and the amount of restitution due and, at the same time, secure credit for acceptance of responsibility, an almost impossible task given his client's disagreements with the government's evidence and theory of the case, which had resulted in counsel for the United States having stated previously during the plea hearing that he had "concerns about the candor of the defendant;" and

d.      that Jones's performance prior to and during the sentencing hearing demonstrated Jones's continuing attempts to try to secure credit for acceptance of responsibility for Marcelino without adding to Marcelino's offense level and the amount of restitution owed.

39.      Marcelino did not allocute at the sentencing hearing nor did he testify at the evidentiary hearing.

40.      The statements in Marcelino's Declaration lack credibility and are not supported by the contemporaneous record.

41.      Marcelino's statements under oath during his plea hearing demonstrate that he understood that he might not receive credit for acceptance of responsibility and that Judge Hudson would consider the advisory Guidelines and other factors and could depart upward or downward from the advisory Sentencing Guideline range.

42.      The Court finds Jones's version of events to be more credible and supported by the contemporaneous record.

43.     The Court further finds that Marcelino's unwillingness throughout the criminal proceedings to admit to the scope of the conspiracy and his role in it resulted in the United States questioning his candor, in particular because the United States had gathered detailed information regarding the scope of the conspiracy and Marcelino's role from the three co-defendants, who pled and cooperated with the United States, and through its own investigation.

44.     Marcelino was unwilling to accept full responsibility for the breadth of his criminal activities in this matter, whether this was due to his desire to reduce his exposure with regard to the length of his term of imprisonment or the amount he would owe in restitution or both.

45.     Gerald Zerkin, expert witness for Marcelino, provided an exhaustive critique of Jones's performance.   Marcelino, however, fails to provide any credible, persuasive evidence that Zerkin or any other attorney could have persuaded Marcelino to act in a manner that would have allowed him to receive credit for acceptance of responsibility or otherwise receive a lower sentence.

### IV. Analysis

**A.     Standard of Review for a Claim of Ineffective Assistance of Counsel**

The standard set forth by the Supreme Court of the United States in *Strickland v. Washington* governs claims of ineffective assistance of counsel. 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that the Sixth Amendment guaranteed a criminal defendant's right to reasonably effective assistance of counsel. *Id.* at 687. To prove a constitutional claim for ineffective assistance of counsel, the petitioner must first show

that his or her counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must demonstrate actual prejudice from the deficiency. *Id.* at 694.

To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).[10] This requires a defendant to show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

As the Supreme Court stated in *Strickland*, "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of

---

[10] As Justice Kennedy noted in *Premo v. Moore*, "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." 562 U.S. 115, 122 (2011) (quoting *Strickland*, 466 U.S. at 690).

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689.

In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697. To prove an actionable claim, a petitioner must demonstrate a "reasonable probability of a different outcome." *See Lenz v. Washington,* 444 F.3d 295, 303 (4th Cir. 2006) (internal citations and quotation marks omitted).

Given the nuanced art of plea negotiations, reviewing courts have been reluctant to define detailed standards for the proper discharge of defense counsel's participation in the process. *Premo,* 562 U.S. at 125. The Court in *Premo* cautioned reviewing courts to be mindful of the "potential for the distortions and imbalance that can inhere in a hindsight perspective." *Id.*

The Court examines Jones's actions in light of the guidance provided by the Supreme Court and other case law.

**B.     Marcelino's Claim Fails**

Marcelino's claim consists of three parts. The first part contends that Jones's performance was ineffective if he advised Marcelino that all he needed to do in order to receive a reduction for acceptance of responsibility was to plead guilty. The Court found, as set forth herein, that Jones did not advise Marcelino that all he had to do to receive credit for acceptance of responsibility was to plead guilty. In fact, Jones advised Marcelino that pleading guilty alone was not sufficient to guarantee credit for acceptance of responsibility. Consistent with U.S.S.G. § 3E1.1, Acceptance of Responsibility, the

commentary thereto, and the case law, a defendant must "clearly demonstrate[] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Moreover, the "appropriate considerations" in "determining whether a defendant qualifies under subsection (a)" include "truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)." U.S.S.G. § 3E1.1 cmt. n.1 (2011).

> To earn the reduction, a defendant must prove to the court by a preponderance of the evidence that he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct. A guilty plea may be evidence of acceptance, but it does not, standing alone, entitle a defendant to a reduction as a matter of right. We recognize that a district court is not obligated to grant an unrepentant criminal a two-step reduction in return for grudgingly cooperating with authorities or merely going through the motions of contrition.

*United States v. Dugger*, 485 F.3d 236, 239 (4th Cir. 2007) (internal citations and quotation marks omitted); *see also United States v. Bolton*, 858 F.3d 905, 914-15 (4th Cir. 2017) (same). The Court found that Jones properly advised Marcelino with regard to the requirements to earn a reduction for acceptance. Marcelino was unwilling to admit to the scope of the conspiracy and his role in it. Consequently, the United States questioned his candor because the United States had learned detailed information regarding the scope of the conspiracy and Marcelino's role in it from the co-defendants and through its own investigation. Jones's performance was not deficient as to the first part of the ineffective assistance of counsel claim because Jones did not tell Marcelino that all he needed to do in order to receive a reduction for acceptance of responsibility

was to plead guilty.

The second part of Marcelino's ineffective assistance of counsel claim asserts that Jones's performance was ineffective when he allowed Marcelino to admit to all of the facts proffered by the government at the plea hearing. The Court concludes that Jones's performance before and during the plea hearing was not deficient. Jones attempted to accommodate Marcelino's desire to plead guilty, limit Marcelino's offense level, limit the amount of restitution due and, at the same time, secure credit for acceptance of responsibility, an almost impossible task given his client's fundamental disagreements with the government's theory of the case and the government's evidence. Jones was aware that there was virtually no chance at all to secure credit for acceptance of responsibility if Marcelino did not plead guilty. Marcelino was adamant that he did not want to go to trial. But, at the same time, Marcelino also refused to admit the extent of his role in the conspiracy and continued to minimize his criminal activity. Given that the United States had extensive information from its investigation and that Marcelino's three co-defendants had pled guilty and cooperated, thereby corroborating information the United States had gathered during its investigation, Jones's actions at the plea hearing did not fall below an objective standard of reasonableness. Jones's objective was to secure a plea for his client, to try to limit his exposure with regard to offense level and restitution, and to keep open the possibility of his client receiving credit for acceptance of responsibility. Jones spoke up during the colloquy to try to limit Marcelino's exposure but Judge Lauck persisted in her questioning of Marcelino directly. When asked by Judge Lauck if there was anything that counsel for the United States said happened that

29

he would say is not true, Marcelino answered freely, "no." (Guilty Plea Hr'g Tr. 25:25–26:3.) In the absence of extraordinary circumstances, the truth of the sworn statements a defendant made during his Rule 11 hearing is "conclusively established." *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005). No circumstances exist here that would lead the Court to consider Marcelino's prior sworn statements as anything other than truthful. And, as noted above, if there had been no plea, Jones knew that the possibility of his client receiving credit for acceptance of responsibility was almost zero. Jones's performance with regard to the second part of Marcelino's claim was within the bounds of reasonable competence and was not deficient.

The third part of Marcelino's ineffective assistance of counsel claim asserts that Jones was ineffective when he allowed Marcelino to attempt to minimize or deny some of the facts admitted to at the plea hearing and did not advise him that it would cost him any chance of receiving credit for acceptance of responsibility. At this point in the proceedings, because of the position of the United States regarding Marcelino, counsel for the United States had previously told Jones that the United States would be satisfied only with "the defendant's statement in his own words," so Jones had no other option but to help Marcelino prepare his version of the facts of the case, which Jones then filed and used to argue for acceptance. While Jones was not successful, Jones's performance with regard to the third part of Marcelino's claim was within the bounds of reasonable competence and was not deficient.

Weighed against the preponderance standard and being mindful of hindsight perspective, the Court concludes that Jones's representation did not fall below an

objective standard of reasonableness in this case. Marcelino was, in this case, the author of his own fate.

Even if the Court were to conclude that Jones's representation fell below an objective standard of reasonableness with regard to any parts of the ineffective assistance of counsel claim, Marcelino still failed to demonstrate any prejudice from counsel's advice and handling of the plea and sentencing. By refusing to confirm what the United States believed but could not prove with regard to the scope of the conspiracy and the sales location of the untaxed cigarettes, Marcelino's offense level remained at 30 rather than 32 and he was ordered to pay restitution in an amount that was $1.65 million less than what it could have been with the New York City taxes. Furthermore, Marcelino's failure to receive credit for acceptance of responsibility and potentially a lower sentence is not attributable to Jones's performance but to Marcelino's refusal to accept full responsibility for his actions.

## V. Conclusion

For the foregoing reasons, it is hereby RECOMMENDED that the Court DISMISS Marcelino's ineffective assistance of counsel claim and DENY the Amended § 2255 motion.

Marcelino is ADVISED that he may file specific written objections to the Report and Recommendation within fourteen (14) days of the date of entry hereof. Each objection should be labeled with the corresponding heading from the Report and Recommendation, should be numbered, and should identify with specificity the legal or factual deficiencies of the Magistrate Judge's findings. Failure to file specific objections

in a timely manner to the Report and Recommendation may result in the entry of an Order denying the motion. *See* Fed. R. Civ. P. 72(b). It may also preclude further review or appeal from such judgment. *See Wright v. Collins*, 766 F.2d 841, 845 (4th Cir. 1985) (noting the general rule that "a party who fails to object to a magistrate's report is barred from appealing the judgment of a district court adopting the magistrate's findings").

Let the Clerk send a copy of the Report and Recommendation to all counsel of record and to the Honorable Henry E. Hudson.

It is so ORDERED.

Richmond, Virginia
Date: August 18, 2017

_____ /s/
Roderick C. Young
United States Magistrate Judge